# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### **AMENDED** CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 18-9166-GW-MAAx | Date | August 2, 2021 |
| Title | *Richard Sotelo v. Rawlings Sporting Goods Company, Inc.* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Terri A. Hourigan | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Janine L. Pollack | Michael R. Annis |
| Michael M. Liskow | |
| Thomas S. Alch | |
| Lee S. Shalov | |

PROCEEDINGS:     **TELEPHONIC HEARING ON PLAINTIFF'S AMENDED MOTION FOR CLASS CERTIFICATION [118]; and DEFENDANT RAWLINGS SPORTING GOODS COMPANY, INC.'S MOTION TO STRIKE THE REPORT AND TESTIMONY OF STEFAN BOEDEKER [127]**


The Court's *redacted* Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, the Motions are continued to August 12, 2021 at 8:30 a.m. The parties are to meet and confer, and file a joint scheduling report by noon on August 9, 2021.

| | : | 35 |
|---|---|---|
| Initials of Preparer | JG | |

*Richard Sotelo v. Rawlings Sporting Goods Company*, Case No. 2:18-cv-09166
Ruling on: (1) Plaintiff's Amended Motion for Class Certification, and (2) Defendant's Motion to
Strike the Report of Stefan Boedeker

This document contains material designated by the parties as confidential and filed under seal.  The parties shall review it and indicated to the Court if there are any portions which should be redacted before the item is filed for public viewing.

## I.   Background

A buyer has to consider several things in choosing the right baseball bat.  These include, but are not limited to, the material it is made of, its length, and its weight.  At issue in this class action lawsuit are whether the defendant misrepresented the weights of the bats it manufactured and sold; and, if so, what should be the consequences.

The physical weight of a bat can be conveyed by manufacturers in two ways.  The first is by providing a number in ounces, *i.e.* the "sticker weight" of a bat.  *See* Second Amended Complaint ("2AC") ¶ 39, ECF No. 114.  The second is by providing the "drop weight" (or sometimes, simply referred to as the "drop") of the bat.  *Id.* ¶ 16.  A bat's drop is a dimensionless quantity defined as the difference between its weight (measured in ounces) and its length (measured in inches), expressed as a negative number.  Given the length of a bat and its drop, adding the two numbers is supposed to give its weight.[1]  For example, a bat that is 32 inches long and weighs 22 ounces has a drop of -10.  *Id.*  A manufacturer may provide both the sticker weight and the drop, just one of the two, or sometimes neither.

Plaintiff Richard Sotelo brings this putative class action against defendant Rawlings Sporting Goods Company, Inc., claiming that Rawlings's bats are heavier than represented.  *Id.* ¶ 39.  According to Sotelo, the actual weight of a Rawlings bat (*i.e.* the "scale weight") is often heavier than the sticker weight or the weight as indicated by the bat's drop.  Sotelo argues that this discrepancy harmed him and the proposed class members, who, had they known about it, would not have purchased the bats or would have paid less for it.  *Id.* ¶ 4.  He now moves to certify a class of California residents that bought certain models of bats manufactured by Rawlings.

A.   Factual Background

1.   *Plaintiff's Purchase*

Rawlings is a manufacturer, marketer, and seller of sporting goods, including baseball bats.

---

[1] As far as the Court can tell, the weight (in ounces) is always less than the length (in inches), so the "drop" can be defined as: $drop = [weight\ in\ ounces] - [length\ in\ inches]$.

*Id.* ¶ 10.  It is responsible for the labeling, packaging, and quality control of its bats.  *Id.* ¶ 11. Rawlings sells its bats directly through its own website, as well as through third-party online sellers and "brick and mortar" retailers throughout the country.  *Id.*  Up until recently, Rawlings labelled most of its bats with a specific length and weight.  *Id.* ¶ 12.

Sotelo is a California citizen.  *Id.* ¶ 9.  In November 2017, Sotelo purchased a new 2018 Rawlings Youth 5150 baseball bat through a third-party retailer's (*i.e.* www.baseballsavings.com) website.  *Id.* ¶ 26.  The bat was 27 inches in length, and had a sticker weight of 16 ounces and a drop of -11.  *Id.* ¶¶ 28-29.  Sotelo bought the bat for his 8-year old son for $72.76 (*id.* ¶ 26), but soon found that his son did not have any better swing control using the bat.  *Id.* ¶ 31.  Curious about its weight, Sotelo weighed the bat and found that the scale weight was about 2.6 ounces heavier than the sticker weight.  *Id.* ¶ 32.

Sotelo alleges that the weight discrepancy with his purchased bat is not an isolated incident, but rather part of a pattern of Rawlings's misrepresenting the weight of its bats.  *Id.* ¶¶ 36-37. According to Sotelo, Rawlings's bats are intentionally heavier than the sticker weight or weight indicated by the bat's drop.

Sotelo asserts that had he known that the actual weight of the 5150 bat that he purchased was not as represented, "he would not have purchased the bat, or would have paid less for it."[2]  *Id.* ¶ 35.  Sotelo also states that the Rawlings authorized dealer's website stated that "If you've purchased a bat (that's under warranty) and are not completely satisfied with its performance, please return it directly to the manufacturer."  *Id.* ¶ 13.

### 2.  *Rawlings's Baseball Bats*

Rawlings offers baseball bats in "adult" and "youth" categories.  *See* Declaration of Rebecca O'Hara in Support of Defendant's Memorandum in Opposition to Plaintiff's Motion for Class Certification ("O'Hara Decl.")[3] ¶ 5, ECF No. 72-3.  Within those categories, it offers various

---

[2] Sotelo's claim that he would have paid less for the 5150 bat had he known that its actual weight was 2.6 ounces heavier than indicated on its sticker does not make sense.  The evidence discussed below shows that: (1) Rawlings sells its bats in a variety of models; (2) within a given model, the bats will vary according to characteristics such as length and weight; and (3) Rawlings does not vary the price of its bats within the same model based on weight. Therefore, had Sotelo known that the actual weight of the 27 inch 5150 model bat that he wanted to purchase was 2.6 ounces heavier than stated on the sticker, his choices would have been: (1) not purchasing the bat at all or (2) selecting a 5150 model with a lower sticker weight (or trying out the available 5150 bats and selecting the one with the weight that he liked) and purchasing it for the same price that he would have paid for the one he initially intended to buy.

[3] O'Hara has worked at Rawlings in product development and engineering since 2006 and became the Senior Manager of Product Development in 2015.  *See* O'Hara Decl. ¶ 3.

"models" of bats[4] which have distinct variable features such as design, composition materials, dimensions, weights, certification standards, etc.  *Id.* ¶ 6.  Rawlings does not necessarily design or engineer its models to match a scale or sticker weight. *Id.* ¶ 8.  Rawlings typically releases a yearly lineup of models within age categories on August 1.  *See* Declaration of Kyle Murphy in Support of Defendant's Memorandum in Opposition to Plaintiff's Motion for Class Certification ("Murphy Decl.")[5] ¶ 8, ECF No. 72-2.  Rawlings historically has set the price of its bats based upon the particular model and, within the model, typically does not alter that price based on the various sticker weights that are available.  *Id.* ¶ 10 ("As an example, a 5150 youth baseball bat . . . will cost the same regardless of [whether] its sticker weight is 16 ounces or 26 ounces.").

Consistent with industry practice, Rawlings has historically labelled and advertised most of its baseball bats with specifications for length (in inches), drop, sticker weight and barrel diameter.  *Id.* ¶ 11.  Most of its bat models are offered in a range of sticker weights and lengths, but with the "sticker weight [being] tied to a bat's assigned drop, and [the] drop is simply a sizing concept rather than an exact measurement."  *Id.* ¶¶ 12-13.

An additional factor in regards to bat specifications which affects its performance is its "swing weight."  Swing weight is independent of scale or sticker weights and two bats with identical scale weights can have very different swing weights (which will in turn strongly affect the player's performance and perceptions as to the bat) depending upon where and how the bat's weight is distributed.  *See* O'Hara Decl. ¶ 7; Murphy Decl. ¶ 16 ("Consider swinging a hammer – the hammer will be harder to swing if you hold at the bottom of the handle, but if you were to flip the hammer around and swing from the hammer end, it will be easier to swing.").  To account for swing weight, Rawlings advertises using qualitative phrases such as "balanced," "end-loaded," or "lighter swing weight" to contextualize how the bat will feel when swung.  *See* Murphy Decl. ¶ 18.

Rawlings is required to design most of its models to the specifications given by third-party entities that certify the models for play in particular leagues.  *See* O'Hara Decl. ¶ 11. Baseball bats offered in the youth category (intended for use by league players ages 7 to 13) are produced

---

[4] "Models" – as that word is used by Rawlings – are baseball bats that have the same design features and characteristics and were manufactured to the same certification standards."  *See* Declaration of Kyle Murphy ¶ 7, ECF No. 72-2.

[5] Murphy worked at Rawlings's baseball bat unit since 2011, before becoming the Director of Product for Bats, Batting Gloves and Accessory & Training Items in 2015.  *See* Murphy Decl. ¶¶ 1, 3.

pursuant to the certification standards of either the USA Baseball (the national governing body for amateur baseball) or the United States Specialty Sports Association. *Id.* ¶ 13. The USA Baseball standards require Rawlings to submit bats for certification



*Id.* ¶ 17.

*Id.* ¶¶ 17-18.

While Rawlings requires its bats to be manufactured to meet certain standards, there will always be some variation as to the scale weight of the bats even if they are made on the same date with the same machinery by the same employees. *Id.* ¶¶ 19-20. Rawlings provides its bat manufacturers with specifications that indicate the acceptable range of variations for certain features of the product, *e.g.* the finished weight or length of the bat.[7] *Id.* ¶ 21.

Beginning with its 2020 lineup of bats,[8] Rawlings changed its labeling to no longer include a sticker weight. *See* Transcript of Dec. 3. 2019 Deposition of Kyle Murphy at 191 ("Murphy Depo."), Exh. B to Defendant Rawlings Sporting Goods Company Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification, ECF No. 72-5 at page 14 of 17. While a drop is sometimes still included, the following disclaimer accompanies it:

> Due to manufacturing tolerances, certification calculations and standards, or added materials such as grip tape or decals, drop is not intended to and should not be relied upon to calculate the actual weight of this bat as sold.

*Id.* at 250, ECF No. 72-5 at page 15 of 17.

B. Procedural History

Sotelo filed an Amended Class Action Complaint ("Am'd Compl.") in January 2019, asserting the following causes of action: (1) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*; (2) violation of California's False Advertising

---

[6] "The weight of grips can vary from bat-to-bat, but grips used by Rawlings on its bats weigh, on average, around 0.5 ounces." O'Hara Decl. ¶ 18.

[7] Rawlings requires its suppliers to produce baseball bats in conformance with various specifications including                    . *See* Declaration of Rebecca O'Hara in Support of Defendant's Memorandum in Opposition to Plaintiff's Amended Motion for Class Certification ("2nd O'Hara Decl.") ¶¶ 7-10, ECF No. 125-2. The finished weight range is typically calculated by              *See* 2nd O'Hara Decl. Ex. G, ECF No. 125-9 at pages 3-4 of 6.              *Id.* at pages 3-6 of 6.

[8] These were available to consumers beginning in August 2019. *See* Murphy Decl. ¶ 8.

Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq*; (3) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq*; (4) breach of express warranty; (5) breach of implied warranty; and (6) unjust enrichment. *See* ECF No. 37. In May 2019, the Court granted Rawlings's motion to dismiss the fifth and six causes of action, and parts of the third. *See* Ruling on Defendant's Motion to Dismiss ("Ruling MTD Am'd Compl."), ECF No. 44. On September 11, 2020, the 2AC was filed. The 2AC appears to raise the same six causes of action as the Am'd Compl. The UCL, FAL and CLRA are solely raised under California law whereas the breach of express and implied warranties and unjust enrichment claims are raised under both California and Missouri law.[9]

On January 17, 2020, Sotelo initially moved to certify a class of "all consumers who purchased in California – either in a retail store, on Rawlings's website, or through a third-party website – any model of Rawlings non-wood adult or youth baseball bats from October 25, 2014 through the present." *See* Plaintiff's Motion for Class Certification at 2, ECF No. 60. He sought to certify a damages class under Fed. R. Civ. P. 23(b)(3) or, alternatively, an injunctive-relief class under Fed. R. Civ. P. 23(b)(2). *Id.*

The Court denied class certification. *See* Ruling on Plaintiff's Motion for Class Certification ("Cert. Ruling"), ECF Nos. 91 (redacted), 103 (unredacted).[10] It found that Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation were all met. *See* ECF No. 103 at pages 6-8 of 12. However, the Court held that Rule 23(b)(3)'s predominance requirement was not met – given that there were hundreds of bat models involved with a wide range of alleged weight discrepancies, including some where there was no weight inaccuracy and others were the weight was actually less than stated. *Id.* at 8-11 of 12. It also denied certifying an injunctive-relief class under Rule 23(b)(2) because Rawlings's change in the

---

[9] This Court dismissed Sotelo's sixth cause of action for unjust enrichment *with prejudice* under California law and noted that, if the case were to continue as a nationwide class action, Sotelo would have to provide a choice/conflict of law analysis. *See* Ruling MTD Am'd Compl. at 11-12. The current class is limited to persons who purchased Rawlings bats in California. *See* Plaintiff's Motion for Class Certification at 2, ECF No. 60. Hence, Sotelo's realleging the unjust enrichment claim in the 2AC is improper. That cause of action will not be addressed further herein.

Additionally, while Sotelo brings the breach of express and implied warranty claims under both California and Missouri law, he does not (nor does Rawlings) cite or refer to any Missouri law in his (its) papers. Therefore, the Court will only consider California law as to those causes of action.

[10] Henceforth, where two ECF docket numbers are provided for the same filing, the first is to the redacted document and the second is to the unredacted version.

labeling of its baseball bats – to no longer include sticker weight and to include a disclaimer about the drop – meant that there was no ongoing purported harm to enjoin. *Id.* at 11-12 of 12.

Sotelo now seeks to certify a narrower class. *See* Plaintiff's Amended Motion for Class Certification ("Am'd Cert. Mot."), ECF Nos. 118, 122. This time, the class is limited to purchasers of 21 specified models of Rawlings youth non-wood baseball bats (with 70 or 71 SKUs[11]) where said bats are "more than 0.5 ounces heavier than the labeled sticker weight." *Id.* at 11 of 36. Specifically, Sotelo seeks certification of the following class:

> Plaintiff asks that the Court certify a class . . . of consumers who purchased in California, either in a retail store, on Rawlings' website, or through a third-party website, any of the following models of Rawlings youth non-wood baseball bats (the "Bats") during the applicable limitations period (which is October 25, 2014 through the present): Model # US8510; Model # US8511; Model # US855; Model # US8F8G; Model # US8M11; Model # US8MC8; Model # US8P11; Model # US8R8; Model # US8V10; Model # US8V11; Model # US9V10; Model # USM210; Model # USRS10; Model # USRSN8; Model # USRX8; Model # UT8534; Model # UT8V34; Model # US8R10; Model # US9510; Model # US9511; and Model # US9V11.2. As per Defendant's specification sheets, each of the Bats within each of the foregoing models has an actual weight that is more than 0.5 ounces heavier than the labeled sticker weight (and whose Drop is likewise inaccurate).

*Id.* (footnotes omitted). Again, Sotelo attempts to certify the class under Rule 23(b)(2) and (b)(3). *Id.* at 2. Filed concomitantly with the Amended Motion was the Declaration of Janine L. Pollack ("Pollack Decl.") – which included (as Exhibit 1) documents produced by Defendant which delineated as to the 21 bat models and related SKUs, *inter alia*, (1) the bat's model/SKU number, (2) the bat's length, weight and drop weight, (3) the bat's "finished weight with all components" and/or "bat weight without package," and (4) a view of the additional components available for the model.[12] *See* Pollack Decl. ¶ 3, ECF No. 119; ECF No. 123. As indicated therein, it appears

---

[11] The parties dispute the exact set of bats involved. Originally, Sotelo specified 21 bat models. As delineated *supra*, a bat model is defined by its set of features, such as its shape, barrel diameter, sweet-spot length, graphics and color, and material composition. For each given model, there are several different size options available which vary in length and weight. Sotelo initially proposed that the class include *all* the sizing options in the 21 bat models, which he claims included 71 different bat "stock-keeping units" ("SKU"). A SKU specifies not only the bat model, but also the specific length-and-size combinations within that model. *See* Am'd Cert. Mot. at 2, n.1; Opp. Am'd Mot. at 3-4. Rawlings pointed out, however, that some of the 71 SKUs in the proposed class did not in fact have a finished weight that was at least 0.5 ounces heavier than their sticker weight. *See* Opp. Am'd Mot. at 4.

For the purposes of this motion, the Court assumes that only bats with an actual finished-weight that is 0.5 ounces or more heavier than the sticker weight are included in the proposed class.

[12] For example, the following is the information provided for the Rawlings Model No. US 8510 27/17 bat:

that the model's length, weight and drop figures were provided for the stripped-down version of the bat; but, after various additional components were added it, the actual weight of the bat would be ████████████████████████████.[13]  *See, e.g.,* ECF No. 123 at pages 2 and 5 of 18; *see also* Murphy Depo. at 78, ECF No. 72-5 at page 8 of 17.

The amended class certification motion also incorporated an expert report from Stefan Boedeker ("Boedeker Report") (*see* ECF No. 61-30) as to a "class-wide method of determining damages that is consistent with Plaintiff's theory of Liability," that was previously filed with the initial motion.  *See* ECF No. 118 at pages 11-12 of 36.  Rawlings has filed an opposition to the amended motion for class certification as well as a *Daubert* motion to exclude the Boedeker Report.  *See* Defendant['s] . . . Memorandum of Law in Opposition to Plaintiff's Amended Motion for Class Certification ("Opp. Am'd Mot."), ECF Nos. 125-1; Defendant['s] . . . Memorandum in



---

[13] Among the additional components that could be added to the bats were: (1) the rubber knob that would be placed at the bottom of the handle, (2) the rubber or polymer tape that is wound around the handle of the bat, (3) the decals that are placed on the barrel of the bat, and (4) the end cap which is placed at the top of the barrel.  *See* ECF No. 123 at page 2 of 18.  Some of those additional components can, in turn, affect the bat's performance.  *See, e.g. ALCOA v. Amerola Products Corp.*, 552 F.2d 1020, 1023 (3rd Cir. 1977) (an end cap can be weighted "to affect the balance characteristics of the bat.").

Support of Motion to Strike the Report and Testimony of Stephan Boedeker ("MTS Boedeker"), ECF No. 128.

## II.   Legal Standard

### A.   Plaintiff's Consumer Protection and Breach of Warranty Claims

Sotelo's claims under California's consumer protection statutes (*i.e.* the CLRA, FAL, and UCL) are governed by the "reasonable consumer" test: *i.e.* a plaintiff must show "members of the public are likely to be deceived." *Ebner v. Fresh, Inc*., 838 F.3d 958, 965 (9th Cir. 2016) (citing *Williams v. Gerber Prods. Co*., 552 F.3d 934, 938 (9th Cir. 2008)). "[T]hese laws prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has the capacity, likelihood or tendency to deceive or confuse the public." *Leoni v. State Bar*, 39 Cal. 3d 609, 626 (1985). However, the test requires more than "a mere possibility" that the labels "might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner." *Ebner*, 552 F.3d at 965 (quoting *Lavie v. Proctor & Gamble Co*., 105 Cal. App. 4th 496, 508 (2003)). Rather, a plaintiff must show a probability that "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id*. (quoting *Lavie*, 105 Cal. 4th at 508).

Under California law, "a plaintiff asserting a breach of warranty claim must allege facts sufficient to show that: (1) the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached." *Mattero v. Costco Wholesale Corp.*, 336 F. Supp. 3d 1109, 1115 (N.D. Cal. 2018) (citing *Weinstat v. Dentsply Internat., Inc*., 180 Cal. App. 4th 1213, 1227 (2010)). To recover on a breach of warranty cause of action, the plaintiff must show the breach caused the plaintiff to suffer injury, damage, loss or harm. *See Cardinal Health 301, Inc. v. Tyco Electronics Corp.,* 169 Cal. App. 4th 116, 145 (2008). Many courts have held that "stating a claim under California consumer protection statutes is sufficient to state a claim for express warranty." *See, e.g. Maisel v. S.C. Johnson & Son, Inc.*, No. 21-cv-00413-TSH, 2021 WL 1788397, at *11 (N.D. Cal. May 5, 2021), quoting *Hadley v. Kellogg Sales Co*., 243 F. Supp. 3d 1074, 1094-95 (N.D. Cal. 2017).

### B.   Class Certification

The proponent of class treatment bears the burden of demonstrating that class certification is appropriate. *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012); *Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 629 (9th Cir. 2018) ("A representative plaintiff may

sue on behalf of a class when the plaintiff affirmatively demonstrates the proposed class meets the four threshold requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation."). Before certifying a class, the trial court must conduct a "rigorous analysis" to determine whether the party seeking certification has met the prerequisites of Fed. R. Civ. P. 23. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1233 (9th Cir. 1996).

Rule 23 requires the party seeking certification to satisfy all four requirements of Fed. R. Civ. P. 23(a) and at least one of the subparagraphs of Fed. R. Civ. P. 23(b). *See id.* at 1234. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The court must consider any material necessary to its determination, though it should not go so far as to engage in a trial of the merits. *See id.* at 350-51 (noting that the "rigorous analysis" required at class certification will "[f]requently . . . entail some overlap with the merits of the plaintiff's underlying claim"); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("[I]t is not correct to say a district court *may* consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits *if they overlap* with the Rule 23(a) requirements.") (emphasis added).

Where, as here, a plaintiff seeks to certify a class action for damages pursuant to Rule 23(b)(3), it must be found that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The "rigorous analysis" – that a district court must utilize in deciding whether the Rule 23(a) requirements have been met – is also applicable in the Rule 23(b) context. Indeed, it has been stated that "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

Additionally, in the context of class certification under Rule 23(b)(3), the named plaintiff must "affirmatively demonstrate" that the proposed class shares a common theory of liability as to each element of the cause of action. *See Comcast Corp.*, 569 U.S. at 33 (quoting *Wal-Mart Stores*, 564 U.S. at 350). Because damages often vary among class members, the party seeking certification must develop a method for calculating damages on a class-wide basis that is reasonably administrable and "consistent with its liability case." *Id.* at 35.

As to class certification under Rule 23(b)(2), it must be shown that: (1) "the party opposing the class has acted or refused to act on grounds that apply generally to the class" and (2) the plaintiffs are seeking "final injunctive relief . . . [that] is appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2); 2 Rubenstein, *Newberg on Class Actions* § 4.27 (5th ed. 2012). In *Wal-Mart Stores*, 564 U.S. at 360-61, the Court instructed that:

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Nagareda, [Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)]. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

C.  Admissibility of Expert Testimony and Consideration in the Context of Class Certification

Federal Rule of Evidence Rule 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The trial court acts as a "gatekeeper" to the admission of expert testimony and must ensure that all admitted expert testimony is "not only relevant but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).

The proponent of the expert testimony has the burden of proving that the proposed expert testimony is admissible under Federal Rule of Evidence 702, *Daubert*, and its progeny. *See Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). This means "the district court can exclude an expert's opinion if the expert fails to identify and defend the reasons" for his conclusions. *Id.* Where the expert's testimony is not the product of peer-reviewed research produced outside the course of litigation, "the expert must explain precisely how [he] went about

reaching [his] conclusions and point to some objective source ... to show that [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field.'" *Id.* at 597 (internal quotations omitted). "A trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Ellis*, 657 F.3d at 982.

In the context of a motion for class certification where expert testimony is proffered by one side and challenged by the other, there are two considerations that are involved. *Id.* First, there is the issue of whether the expert evidence is admissible under *Daubert*. *Id.* Second, if that evidence is found to be admissible, the court must thereafter conduct the "rigorous analysis" of the expert's testimony/data and judge its persuasiveness in regards to the Rule 23 factors. *Id.*; *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 786 (9th Cir. 2021).

The Ninth Circuit in *Olean Wholesale* extensively discussed the duties of the district court when representative/statistical expert testimony is proffered by both sides at the class certification stage on a key issue in regards to predominance (in *Olean Wholesale*, whether the Rule 23(b)(3) class contained a significant number of uninjured class members). Initially the Circuit recognized that "[t]he acceptance of representative evidence at the class certification stage is nothing new . . . . [and the] Supreme Court has held that representative evidence can be relied on to establish a class. 993 F.3d at 786. However, it went on to caution that:

> There is reason to be wary of overreliance on statistical evidence to establish classwide liability. Academic literature abounds observing that "judges and jurors, because they lack knowledge of statistical theory, are both overawed and easily deceived by statistical evidence." *United States v. Veysey*, 334 F.3d 600, 604 (7th Cir. 2003). If "highly consequential evidence emerges from what looks like an indecipherable" statistical model to most "non-statisticians," it is "imperative that qualified individuals explain how the [model] works," and courts must "ensure that it produces reliable information." *United States v. Gissantaner*, 990 F.3d 457, [463] (6th Cir. 2021).
>
> Moreover, the use of representative evidence cannot "abridge, enlarge or modify [a plaintiff's] substantive right[s]." *See* 28 U.S.C. § 2072(b). Otherwise, its use would contravene the Rules Enabling Act. *Id.* Class actions are merely a procedural tool aggregating claims, *Sprint Commc'ns Co. v. APPCC Servs., Inc.*, 554 U.S. 269, 291, 128 S. Ct. 2531, 171 L. Ed. 2d 424 (2008), and Rule 23 "leaves the parties' legal rights and duties intact and the rules of decision unchanged," *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408, 130 S. Ct. 1431, 176 L. Ed. 2d 311 (2010) (plurality opinion). The use of representative evidence at the class certification stage must therefore be closely and carefully scrutinized, and "[a]ctual, not presumed, conformance" with Rule 23's

requirements is "indispensable." *Wal-Mart*, 564 U.S. at 351 (simplified).
*Id.* at 786-87 (footnotes omitted).  Thereafter, the Circuit reversed the class certification order because – even though the district court had gone "beyond a *Daubert* analysis and . . . recognized it was required to determine whether the expert evidence was 'in fact persuasive' . . . . [and had] even walked through the strengths and weaknesses of the experts' competing testimony . . . . [and] despite acknowledging there were 'potential flaws' in the Plaintiffs' expert's methodology" – the district court had made no finding resolving the parties' dispute as to the representative evidence. *Id.* at 793-94.  As characterized by the Circuit, "[r]ather than resolving the dispute, however, the district court merely considered whether Plaintiffs' statistical evidence was 'plausibly reliable' and otherwise left determination of this question to the jury."  *Id.* at 792.  That was error because "the threshold predominance determination cannot be outsourced to a jury."  *Id.* at 791; *see also Ellis*, 657 F.3d at 982 ("the district court seems to have confused the *Daubert* standard it correctly applied to Costco's motions to strike with the "rigorous analysis" standard to be applied when analyzing commonality.  Instead of judging the persuasiveness of the evidence presented, the district court seemed to end its analysis of the plaintiffs' evidence after determining such evidence was merely admissible.").

## III.   Discussion

The Court continues to find that Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy are met here for the same reasons set forth in the prior ruling on Sotelo's first motion for class certification.  *See* Cert. Ruling. at 5-7.  The remaining issues are whether Sotelo's narrowing of his proposed class fixes the predominance issue identified previously and whether his proposed damages model is adequate.

A.   The Predominance Requirement

1. *Applicable Law*

For a class action for damages to be certified pursuant to Rule 23(b)(3), it must be found that the questions of law or fact common to the class must "predominate" over questions affecting only individual members.  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).  As observed in *Jabbari v. Farmer*, 965 F.3d 1001, 1005 (9th Cir 2020):

> To determine whether a class satisfies the requirement, a court pragmatically compares the quality and import of common questions to that of individual questions . . . *see also* 2 William B. Rubenstein, *Newberg on Class Actions* § 4:50 (5th ed. 2018) ("[A] court must first characterize the issues in the case as common or individual and then weigh which predominate." (emphasis omitted)).

This task is not an exact science. Rather, a court must determine which questions are likely "to drive the resolution of the litigation." *Torres v. Mercer Canyons Inc*., 835 F.3d 1125, 1134 (9th Cir. 2016). If a common question will drive the resolution, even if there are important questions affecting only individual members, then the class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windso*r, 521 U.S. 591, 623-24, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997); *see also Tyson Foods*, 136 S. Ct. at 1045.

Also relevant is whether a district court certifies a class for settlement or for trial. *In re Hyundai & Kia Fuel Econ. Litig. (Hyundai II)*, 926 F.3d 539, 558 (9th Cir. 2019) (en banc).

"An individual question is one 'where members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods*, 136 S. Ct. at 1045 (quoting *Newberg on Class Actions* § 4:50).

### 2. Prior Ruling on Predominance

In its prior ruling on predominance, this Court observed that:

Rule 23(b)(3) requires that common questions in this action predominate the individualized issues. The predominance analysis focuses on "the legal or factual questions that qualify each class member's case as a genuine controversy" and is "much more rigorous" than Rule 23(a)(2)'s requirement of commonality. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). It does not involve counting the number of common issues, but weighing their significance. *See, e.g.,* [*Local Joint Exec. Bd. v. Las Vegas*] *Sands*, 244 F.3d [1152] at 1163 [(9th Cir. 2001)] (contrasting the "number and importance" of common issues with the "few" and "relatively easy" individualized issues). In addition, the predominance analysis looks, at least in part, to whether there are common issues the adjudication of which "will help achieve judicial economy," further the goal of efficiency, and "diminish the need for individual inquiry." *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 at 939, 944 (quoting and citing *Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180, 1189 (9th Cir. 2001)).

The alleged misrepresentations are not – contrary to Plaintiff's argument – uniform. This is because Rawlings has manufactured and sold hundreds of different baseball bat models that fall within the proposed class. Opp. at 15-16. Sotelo has not alleged specific weight discrepancies for those hundreds of bat models. The alleged misrepresentations of weight are "uniform" only if one, as Sotelo does, speaks at a high level of generality by alleging that the scale weights are all greater than the sticker weights or weights implied by the drop. However, this high level of generality [. . .] glosses over the individualized questions for each bat model about whether any discrepancy in weight is material. For example, the bat purchased by Sotelo allegedly has a scale weight of 18.6 ounces, even though its sticker weight is 16 ounces. FAC ¶ 3. Whether a 2.6 ounce difference for this bat

is material is one question. Whether a 2.6 ounce difference for a bat that has a sticker weight of 33 ounces and a scale weight of 35.6 ounces poses a different question. Whether a 0.4 ounce difference for a bat model that has a sticker weight of 33 ounces and a scale weight of 33.4 ounces poses yet another question.

Sotelo's argument that "Defendant's misrepresentations were material regardless of the degree of the misrepresentation" is not supported by the evidence or reality. A discrepancy of 0.01 ounces is "so obviously unimportant that [a] jury could not reasonably find that a reasonable person would have been influenced by it." *Stearns v. Ticketmaster Corp*., 655 F.3d 1013, 1022 (9th Cir. 2011) (citing *Steroid Hormone Prod. Cases*, 181 Cal.App.4th 145, 147 (2010)). Such a small difference would be imperceptible to most people and within the margin of error for scale devices such as the one Sotelo used to weigh his bat. This finding is not disturbed by Sotelo's survey evidence, where "90.7% of respondents stated that the weight was either very important or important," and of those people "91.7% stated that if the weight was misstated it would be either very important or important to their purchase decision." *Id*. at 6. It is one thing to say that weight is important and knowing about a discrepancy would be important in the purchase decision. It is an entirely different thing to say that any discrepancy, no matter how small, would be material.

Given the hundreds of bat models involved, the Court must decide whether the common issues predominate the individualized ones about whether any given weight discrepancy is material. While a discrepancy of 0.01 ounces is obviously immaterial, as that number goes up, at some point it will become material. That point is not fixed across the whole universe of bats. A child may immediately notice if his 16 ounce bat suddenly becomes 0.2 ounces heavier; an adult may not notice any difference if 0.2 ounces is suddenly added to his 33 ounce bat. As Sotelo notes, at this stage he does not need to prove that the alleged misrepresentations are material. Pl. Supp. at 3. However, he must show that a jury attempting to determine whether these alleged discrepancies are material will not be bogged down in individualized inquiries into the hundreds of bat models involved.

The Court is not convinced that common issues predominate the individualized ones here. This case presents an even greater predominance problem than in *Jones v. ConAgra Foods, Inc*., 12-cv-01633-CRB, 2014 WL 2702726, at *1 (N.D. Cal. June 13, 2014), where the alleged misrepresentations defendant's tomatoes were "100% Natural" and "Free of artificial ingredients & preservatives" spanned seven segments of tomato products (diced tomatoes, crushed tomatoes, stewed tomatoes, whole tomatoes, tomato sauce, tomato puree, and tomato paste) that were sold in numerous varieties and sizes. As with Sotelo's proposed class, the court in ConAgra found "a lack of cohesion among the class members" because consumers were exposed to label statements that varied among the different product offerings. Unlike the challenged statements in ConAgra ("100% Natural" and "Free of artificial ingredients & preservatives"), which were "facially uniform" across the different product offerings, the alleged misrepresentations here about the scale weights of the bats are as numerous as the number of baseball bat models caught up in Sotelo's proposed class. If the "consumers' understanding of those [facially uniform] representations [in ConAgra] would not be [amenable to class

treatment]," *id*. at *14, then Sotelo has a very uphill task of showing that the proposed class members had anything like a common understanding of the alleged misrepresentations here.

This would be a very different case if Sotelo alleged that the scale weights of Rawlings's bats were consistently – across all bat models – x or more ounces heavier than the sticker weight or weight implied by the drop. Then a jury would have to resolve a much smaller set of common questions to determine if the misrepresentations were material across all the bats. For example, is x ounces material when the bat's sticker weight is 16 ounces? 20 ounces? 30 ounces? But that is not what we face here. As noted earlier, it appears that some of Defendant's bats in fact weigh less than their sticker weight. Certifying the class now, as Sotelo asks, would have improperly swept these bats into the class. How would the Court have later filtered out these bats other than an individualized inquiry into each particular bat? The plaintiff bears the burden of demonstrating that class certification is appropriate. The Court finds that Sotelo has not carried that burden on the predominance requirement.

*See* Cert. Ruling at 7-10 (footnotes omitted), ECF No. 103.

### 3. Analysis of Predominance as to the Present Delineated Class

Sotelo now proposes a narrower class limited to purchasers of specified models of Rawlings youth non-wood bats where the actual weight (*i.e.* the "finished weight with all components") was 0.5 ounces or more heavier than the sticker weight or drop. *See* Amended Cert. Motion at 2. This revised definition narrows the universe of bat models from hundreds of models to just 21. Between all the sizing options that each model comes in, the proposed class involves roughly 70[14] different bat SKUs. Further, all of the bats in the class would have the common characteristic of being at least 0.5 ounces heavier than the indicated sticker/drop weights.

Sotelo contends that Rule 23(b)(3)'s predominance requirement is now met as the common question/proof in regards to materiality and reliance will drive the resolution of this litigation. He argues that:

> "When analyzing false advertising claims . . . courts routinely find that common questions predominate." *Sonner* [*v. Schwabe N. Am., Inc.*], 2019 U.S. Dist. LEXIS 117623, at *18 (citations omitted). The central question here is whether Defendant's mislabeling and deceptive advertising of the Bats was "likely to deceive a reasonable consumer." *Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2016 U.S. Dist. LEXIS 92374, at *11 (N.D. Cal. July 15, 2016). * * * * Because a plaintiff need only show consumers are likely to be deceived, the "reasonable consumer" analysis is "based on common facts, that is, identical statements on the [product labels] at issue." *Id.* "[W]here numerous consumers are exposed to the same dubious practice by the same seller . . . proof of the prevalence

---

[14] The parties appear to dispute the precise number. *See* note 11, *supra*.

of the practice as to one consumer would provide proof for all." *Id*. (internal quotations omitted).

\* \* \* \*

Importantly, at class certification, to determine whether common issues predominate, the court "neither decides the merits of the parties' claims or defenses" nor "decide[s] whether the plaintiffs are likely to prevail on their claims. Rather, the Court must determine whether plaintiffs have shown that there are plausible classwide methods of proof available to prove their claim." *Wolph* [*v. Acer Am. Corp.*], 272 F.R.D. [477], 487 (N.D. Cal. 2011) . . . . As such, the only inquiry at this point is whether Plaintiff has sufficiently shown that "the materiality inquiry is a common question susceptible to common proof that helps to establish predominance." *Broomfield v. Craft Brew All, Inc.*, 2018 U.S. Dist. LEXIS 177812, at \*34 (N.D. Cal. Sept. 25, 2018). "Because materiality is an objective question based on the reasonable consumer, it is common to the class and 'ideal for certification.'" *Id*. (quoting *Amgen* [*Inc. v. Connecticut Ret. Plans & Trust Funds*], 568 U.S. [455] at 481 [(2013)]).

*See* Amended Cert Motion at 18-19.  The Court does not find Sotelo's *ipse dixit* predominance analysis – *i.e.* that, because he is bringing a class action based upon purported mislabelling of products, materiality and reliance are the central issues which will automatically be susceptible to common proof – to be sufficient, persuasive, or controlling.

First, the Court notes that there have been many class action cases alleging mislabelling and/or false advertising under California law where it was held that the Rule 23(b)(3) predominance requirement was not met.  *See, e.g., Reitman v. Champion Petfoods USA, Inc.*, No.: CV 18-1736-DOC-(JPRx), 2019 WL 7169792, at \*7-10 (C.D. Cal. Oct. 30, 2019), *aff'd*, 830 F. App'x 880 (9th Cir. 2020); *In Re Tropicana Orange Juice Mktg. and Sales Practice Litig.*, No. 2:11-07382, 2019 WL 2521958, at \*6-7 (D.N.J. June 18, 2019) (applying California law as to a class of consumers who purchased the defendant's orange juice products at any Costco store in California during the relevant period of time); *Alvarez v. NBTY, Inc*, 331 F.R.D. 416, 422-26 (S.D. Cal. 2019); *In re 5-Hour Energy Mktg. & Sales Practices Litig.*, No. ML 13-2438 PSG (PLAx), 2017 WL 2559615, at \*6 (C.D. Cal. June 7, 2017).

More importantly, there have been a number of recent Supreme Court, Ninth Circuit, and relevant district court decisions which convinces this Court that the current predominance problems herein arise from injury (and concomitantly standing) and damages issues as well as materiality and/or reliance elements.

As recently held by the Supreme Court in a class action case brought under Fair Credit and Reporting Act ("FCRA"), only plaintiffs concretely harmed by a defendant's statutory violation

have Article III standing to seek damages against that private defendant in federal court. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021). In *TransUnion*, a class of 8,185 individuals sued the defendant alleging that it had – by failing to maintain the accuracy of their credit files – violated the FCRA which provides for a private cause of action that includes recovery of actual damages, statutory damages of not less than $100 or more than $1,000, and punitive damages. For 1,853 class members, their misleading credit reports were provided to third-parties but, as to the remaining 6,332 class members, it was never shown that their reports were ever released. The district court certified a class for all 8,185 persons and a jury awarded both statutory and punitive damages to each class member, which was affirmed by the Ninth Circuit. The Supreme Court reversed observing that "[t]o have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. No concrete harm, no standing." *Id.* It was held that the mere existence of inaccurate information, absent dissemination, traditionally has not provided the basis for a lawsuit in American courts and that the plaintiffs cannot demonstrate that the misleading information in the internal credit files itself constitutes a concrete harm. *Id.* at 2209. The Court also stated that "[o]n remand, the Ninth Circuit may consider in the first instance whether class certification is appropriate in light of our conclusion about standing." *Id.* at 2214.

      In *Olean Wholesale*, the Ninth Circuit instructed that:

> When considering if predominance has been met, a key factual determination courts must make is whether the plaintiffs' statistical evidence sweeps in uninjured class members. As the district court recognized, Plaintiffs "must establish, predominantly with generalized evidence, that all (or nearly all) members of the class suffered damage as a result of Defendants' alleged anti-competitive conduct." *Packaged Seafood*, 332 F.R.D. at 320 (simplified). If a substantial number of class members "in fact suffered no injury," the "need to identify those individuals will predominate." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018) . . . .

993 F.3d at 791. It was also noted that: "[a]lthough we have not established a threshold for how great a percentage of uninjured class members would be enough to defeat predominance, it must be de minimis. Even though 'a well-defined class may inevitably contain some individuals who have suffered no harm,' . . . the few reported decisions involving uninjured class members 'suggest that 5% to 6% constitutes the outer limits of a de minimis number,' *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 624-25 . . . (D.C. Cir. 2019) (simplified) . . . ." *Id.* at 792.

      Turning to the class claims herein, the mislabelling that is the subject of this lawsuit is

Defendant's former placements of a sticker weight and/or a drop on the designated models of its youth metallic bats that were allegedly incorrect (or at least misleading) due to bat's scale (or finished with components) weight being 0.5 ounces or more heavier than indicated.  There is no dispute that, generally, a bat's actual weight is one of a number of concerns to many purchasers of youth baseball bats.  However, there is a question as to whether (and to what extent) a weight difference of 0.5 ounces (and thereafter higher increments) is material to members of the class sought to be certified.

Sotelo's argument – that 0.5 ounces can be used as a presumptive starting point for finding materiality – is based on two contentions: (1) that Rawlings utilizes a ███████████████████ ████████████████ the estimated finished weight of the bat (*see* Am'd Cert. Mot. at 4-5), and (2) Rawlings engaged in certain machinations which purportedly demonstrated its awareness of the importance of its bats' finished weights.  *Id.* at 5-11.  Neither contention is sufficient.  As to the latter, none of Rawlings's actions or statements referenced by Sotelo actually deals with the 0.5+ ounce metric.  They do relate to bat weight generally and some pertain to discrepancies between the sticker weight and the actual or finished weight; but none focus on the issue of using 0.5 ounces as the starting point for materiality.

Turning to Sotelo's other assertion, while ████████████████████████ ██████████████████████████████████████████ ████████████████████  *See* 2nd O'Hara Decl. ¶¶ 5-12.  The ████████████████ ██████████████  *Id.*  Further, it is not used as a criterion for assuring the accuracy of the bats' weights or in regards to consumers' expectations in regards to sticker/drop weights.[15]  As stated in the 2nd O'Hara Decl. ¶¶ 10, 11:



Thus, there is no evidence that a differential of 0.5 ounces is material to class members.  Moreover,

---

[15]  Indeed, Rawlings's manufacturing tolerances are kept confidential and are not disclosed to the public.  *See* 2nd O'Hara Decl. ¶ 5.



the ██████████████████ is as to *both* overweight and underweight.  *See* Dec. 4, 2019 Deposition of Rebecca O'Hara at 54-55, ECF No. 125-9.  Therefore, bats produced for a particular model SKU ██████████████████ without their being rejected under the tolerance.  Consequently, even assuming for purposes of argument that Sotelo's contention regarding the ██████████████████ has some viability, the actual tolerance is ██ ██████████.[16]

The problem remains that Sotelo has not proffered evidence that all (or even a majority of) class members would consider 0.5 ounces (his chosen cut-off weight differential) as being material.[17]  Previously, Sotelo proffered the results from an on-line survey from Thomas J. Maronick which reported, *inter alia*, that, of the 301 participants who had bought metal, composite or hybrid bats from any source, 91.7% indicated that weight variance was very important or important to their purchase decision if the weight of the bat was heavier than what was stated on the bat or advertised about the bat.  *See* Thomas J. Maronick, "An Empirical Analysis of the Importance of the Claimed Weight of Baseball Bats on Purchase Behavior" at 4 ("Maronick Report"), ECF No. 61-31.  Aside from indicating that more than a de minimis number of purchasers do not consider the bat's weight being heavier than represented on the sticker to be important at all to their purchasing decision, the survey is insufficient for present purposes because it only required the participants to respond to the general question of whether a bat's weight being heavier than stated would be important, as opposed to the question that is relevant herein – whether a bat's weight being 0.5 ounces heavier than stated would be significant.

Additionally, Rawlings supplied an Expert Rebuttal Report from Bruce Isaacson ("Isaacson Report") in response to the Maronick Report.  *See* ECF No. 73-24.  Isaacson criticized the Maronick Report as follows: (1) Maronick did not ask his participants specific and relevant questions which could actually establish materiality of weight or weight drop in consumer decisions to purchase baseball bats (*e.g.* "The Maronick Survey does not ask whether respondents would be less likely to purchase the bat if the actual weight or weight drop differed from the specified weight or weight drop."); (2) the Maronick Report contains vague terms and questions;

---

[16] It does not appear that, as to the youth bats at issue in this case, the sticker weights or drops are indicated in units smaller than one ounce, which would also belie the assertion that 0.5 ounce differentials are material to consumers.

[17] As pointed out by Rawlings, 0.5 ounces is the weight of "half a pencil" or "three sheets of paper."  *See* Opp. Am'd Mot. at 2, n.1 (citing to https://weightofstuff.com/things-that-weigh-1-ounce).

(3) the Maronick Report has no controls such that its measurements cannot account for bias, inattentiveness or other extraneous factors; and (4) the universe of respondents who completed Maronick's survey was not representative of the class of persons for whom certification is sought (*i.e.* persons who actually purchased Rawlings bats – according to Isaacson, only 19.9% of those who participated in Maronick's survey had previously bought Rawlings bats). *Id.* ¶¶ 35-72. Isaacson also presented the results of his own on-line survey of 150 individuals who purchased Rawlings non-wood bats in California within the prior two years. *Id.* ¶¶ 14-21, 73-149. Among the findings of the Isaacson Report are: (1) "On a net basis, 83.4% of Rawlings purchasers indicated that they considered weight at the time of purchase, and 49.4% of Rawlings purchasers considered weight drop" and (2) "On a net basis, only 13.3% of Rawlings purchasers answered that they would have been less likely to purchase the baseball bat if they had understood that the weight may differ from indicated. Similarly, only 9.0% of Rawlings purchasers answered that they would have been less likely to purchase if they had understood that the weight drop may differ from indicated."[18] *Id.* ¶ 155.

Further, there has been no showing that a mislabelling/misrepresentation of a bat's weight by 0.5 ounces will have an actual and directly calculable effect on the consumer. The present situation is not one of a product being sold by weight, where the price and weight have an immediate correlation (and, concomitantly, directly resulting in loss and/or injury). Indeed, the weights of the designated Rawlings bats have no bearing on their price – *i.e.* the price for bats which fall within a particular model is the same whether the bat tips the scales at 16 ounces or 26 ounces. While a bat's actual weight can have an effect on the consumer's use of it, (1) in most instances, the weight goes to a particular batter's preference and there is no showing as to the degree to which variations from that weight preference will result in the degradation or enhancement of the batter's performance; and (2) there are other factors which will affect performance (such as the bat's length, composition, grip size, etc.) including other weight factors (such as the bat's swing weight and the weight of the end cap that is placed on the bat).

Finally, it appears that the current class definition is overbroad in that it includes persons who may not have been injured by Rawlings's alleged mislabelling/misrepresentation as to actual

---

[18] This Court considers the Isaacson Report not for the purpose of attempting to reach a decision on the merits of Sotelo's claims but merely as part of its obligation to determine whether Sotelo's proffered survey evidence: (1) is sufficient to demonstrate compliance with Rule 23(b)'s predominance requirement and (2) can establish a nexus between his legal liability theory and his damages model. *See Olean Wholesale*, 993 F.3d at 786-87.

weight of their bats.  If a substantial number of class members in fact suffered no injury, the need to identify those individuals will predominate.  *Olean Wholesale*, 993 F.3d at 791.  First, as noted above, Sotelo has not established the materiality of a 0.5 ounce difference between the sticker/drop weight and a bat's actual weight.  Second, there are class members who would not appear to have been misled by the purported mislabelling.  For example, class members who previously purchased a Rawlings baseball bat and were satisfied enough with its performance to thereafter acquire another Rawlings bat would not have relied on the purported misrepresentation.[19]  Likewise, customers who bought a bat at a retail store after trying it out would similarly not have based their decision on the sticker/drop weight, but rather upon their own experience in testing the products themselves.  Moreover, there can be purchasers of the designated bats whose performance on the mislabelled bats actually improved due to other features of the product including its diameter, swing weight, and end cap weight.  Consequently, there is an issue as to overbreadth (*see Olean Wholesale*, 993 F.3d at 791) and as to whether there is a lack of concrete harm as to certain class members so as to raise an issue of Article III standing (*see TransUnion*, 141 S. Ct. at 2214).

For all of the above reasons, the Court finds that Sotelo has not established predominance under Rule 23(b)(3) as to his revised class.

B. <u>Sotelo's Chosen Theory of Damages and the Boedeker Report</u>

"Rule 23(b)(3)'s predominance requirement takes into account questions of damage."  *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017).  "In order to satisfy the Rule 23(b)(3) predominance requirement, Plaintiffs must present a damages model that demonstrates that damages can be *reliably* calculated on a class-wide basis."  *Reitman v. Champion Petfoods USA, Inc.*, No. CV 18-1736-DOC (JPRx), 2019 WL 7169792, at *11 (C.D. Cal. Oct. 30, 2019) (emphasis added).  Although "the amount of damages is invariably an individual question and does not defeat class action treatment," *Leyva, v. Medline Indus. Inc*., 716 F.3d 510, 514 (9th Cir. 2013), the Supreme Court has cautioned that:

> It follows that a model purporting to serve as evidence of damages . . . must measure only those damages attributable to [plaintiff's] theory [of damages].  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).  Calculations need not be exact, . . . but at the class-certification stage (as at trial),

---

[19] According to statistics referenced in the Expert Report of Ronald T. Wilcox, approximately one-third of Rawlings baseball bats sold between October 2013 and January 2020 were purchased by persons who had previously bought a Rawlings bat.  *See* ECF No. 73-19 at page 11 of 45.

> any model supporting a "plaintiff's damages case must be consistent with its liability case . . . . And for purposes of Rule 23, courts must conduct a " 'rigorous analysis' " to determine whether that is so.
>
>   The District Court and the Court of Appeals saw no need for respondents to "tie each theory of antitrust impact" to a calculation of damages. That, they said, would involve consideration of the "merits" having "no place in the class certification inquiry." That reasoning flatly contradicts our cases requiring a determination that Rule 23 is satisfied, even when that requires inquiry into the merits of the claim. The Court of Appeals simply concluded that respondents "provided a method to measure and quantify damages on a class-wide basis," finding it unnecessary to decide "whether the methodology [was] a just and reasonable inference or speculative." Under that logic, at the class-certification stage any method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity.

*Comcast Corp.*, 569 U.S. 35-36 (citations omitted).

Sotelo's theory of damages is as follows: "For claims under the UCL, FAL, and CLRA, damages or restitution may be proven on a class-wide basis through "a diminution in value theory, *i.e.*, the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information." . . . . The same is true for warranty claims."[20]  *See* Am'd Cert. Mot. at 23-24. The only evidence provided by Sotelo in support of a method for calculating those damages was the Boedeker Report. *See* Am'd Cert. Mot. at 23-25.

But Boedeker has not actually completed any survey or study. Rather in his report, Boedeker proposes to conduct a "choice-based conjoint ('CBC') analysis and market simulation to assess empirically actual and but-for demand had consumers been informed at the point of

---

[20] Sotelo does not appear to be seeking damages under a theory of nonrestitutionary disgorgement; and, even if he were, such damages would not be available herein. As stated in *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1113 (N.D. Cal. 2018):

> [I]t is well-established that nonrestitutionary disgorgement, "which focuses on the defendant's unjust enrichment," is "unavailable in a . . . class action" under the FAL, CLRA, and UCL. *In re Tobacco Cases II*, 240 Cal. App. 4th at 800; *see Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 460 ("We disagree and shall conclude that nonrestitutionary disgorgement is not an available remedy in a UCL class action."); *Koehler v. Litehouse, Inc.*, 2012 U.S. Dist. LEXIS 176971, 2012 WL 6217635, at *7 (N.D. Cal. Dec. 13, 2012) (prohibiting the plaintiff from seeking disgorgement of "ill-gotten gains" under the FAL because (1) this amounted to nonrestitutionary disgorgement; (2) nonrestitutionary disgorgement is not allowed under the UCL; and (3) "[t]he restitutionary remedies of the UCL and FAL . . . are identical and are construed in the same manner" (citing *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 177 n.10, 96 Cal. Rptr. 2d 518, 999 P.2d 706 (2000))); *Ivie v. Kraft Foods Global, Inc.*, 2015 U.S. Dist. LEXIS 5196, 2015 WL 183910, at *2 (N.D. Cal. Jan. 14, 2015) ("[N]onrestitutionary disgorgement is not a remedy under the UCL, FAL, or CLRA.").

purchase that the Claims of the Product are false and misleading as alleged in the Complaint." *See* Boedeker Report ¶ 38. However, the exact details of that study/survey/analysis are either unclear or not finalized. For example, the proposed survey was based on the original Complaint and not on the allegations and contentions delineated in the 2AC. Hence, the limitation of the mislabelling – only to specified products where the sticker/drop weights are off by 0.5 ounces or more – has not been incorporated; nor is there any explanation as to how that could or would be done. Whether the survey participants will be limited to actual purchasers of Rawlings non-wood bats is also uncertain. *Id.* ¶ 47 and note 22. Boedeker has not delineated the exact questions he will be utilizing and, as it has been repeatedly noted, phraseology is extremely important in the conduct of any such survey. Further, Boedeker's proposed survey assumes, but does not establish, the materiality of the mislabelling. Finally, Boedeker does not really demonstrate exactly how his study would determine "the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information."

It is clear that Sotelo is attempting to proffer the Boedeker Report as containing a method of measuring damages herein that would be applicable classwide. However, there are a number of reasons why it simply fails to do so at this time. First, as noted, it is based on a former pleading (*i.e.* the Am'd Compl.), where the class was defined as being "nationwide" with a subclass of California purchasers and included all Rawlings bats where there was any difference between the weight on the label of the bat and its actual weight. *See* Am'd Compl. ¶¶ 39-40. The current operative class definition is vastly and substantially different. *See* 2AC ¶ 39 (*e.g.*, only consumers who purchased in California[21] specified models of Rawlings non-wood youth baseball bats with a weight discrepancy of +0.5 ounces). Second, the Boedeker Report is not a completed study/survey/analysis but is merely a general offer of proof as to how a choice-based conjoint analysis could be conducted. The Court finds it too vague and general for the Rule23(b)(3) rigorous examination to be performed. *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 551-52 (C.D. Cal. 2014). Third, the Boedeker Report itself does not verify the elements of materiality and reliance which would be required under Sotelo's causes of action, nor does it establish the

---

[21] It is somewhat unclear what is meant by "consumers who purchased in California." Is the term limited to persons who were themselves physically present in the state at the time the purchase was completed? For example, what would happen in the situation where: (1) a California resident purchases a Rawlings bat while in another state; or (2) a Nevada resident while physically in Las Vegas buys a bat from a third party online seller that operates in California.

preponderance factor.   It merely assumes that those requisites exist or will be demonstrated elsewhere.   Fourth and relatedly, as held above, Sotelo has not demonstrated predominance under Rule 23(b)(3) as to his revised class.   Given that finding, the Boedeker Report must also be rejected at this point because, without predominance being established, the underpinnings of any viable damages analysis would be removed.   Fifth, the Court has found that the class as currently defined appears to be overbroad because it includes persons who may not have been injured at all by Rawlings's purported mislabelling/misrepresentation as to the actual weight of certain of its models.   Any study of damages which incorporates such individuals and/or their input – more than slightly – would *ipso facto* be defective.   *See Olean Wholesale*, 993 F.3d at 791.   Sixth, the reports of all of the experts in this case indicate that there are multitudes of considerations that are factored in by purchasers of baseball bats in varying degrees of importance.   *See, e.g.*, (1) as indicated in Table 6 of the Maronick Report: 89.7% of the respondents stated that the length of the bat was very important or important; 90.7% as to weight of the bat; 86.7% as to the bat's composition; 68.7% as to its brand/manufacturer; 77.7% as to the bat's price; 94.3% as to the feel of the bat; 76.4% league certification; 84.7% weight drop; etc. (*see* ECF No. 61-31 at 9 of 32); and (2) as indicated in Table A1 of the Isaacson Report: 90.7% of the respondents stated that they considered the weight of the bat in making their purchasing decision; 89.3% as to the feel when holding or swinging the bat; 88% the length of the bat; 86% the composition of the bat; 82% its price; 80% the overall appearance of the bat; 73.3% its brand name; 73.3% the width or diameter of the bat; 66.7% whether the bat was approved by a baseball league; 62.7% recommendations from coaches, friends, or other people; 56.7% the drop weight; 47.3% online reviews of the bat; etc. (*see* ECF No. 73-24 at 39 of 352).   Given those many variables and the amorphous nature of the Boedeker Report, it appears rather speculative that Boedeker can accurately isolate the difference between what a class member paid for the Rawlings bat and what a reasonable consumer would have paid at the time of purchase for the bat without the alleged misinformation as to the bat's being 0.5 ounces or more heavier than stated on its sticker or drop.[22]   Moreover, it is also unclear whether

---

[22] As observed in *Ang v. Bimbo Bakeries USA, Inc.*, No.13-cv-01196-HSG, 2018 WL 4181896, at *15 (N.D. Cal. Aug. 31, 2018):

> Dr. May states that "from an economic standpoint," he does not "need to identify 'all' factors that might influence prices [and/or] volume sold in my analysis." . . . . Rather, he "simply need[s] to control for factors that are significantly correlated with the labeling claim and might also influence price [and/or] volume sold depending on which is the dependent variable." . . . . He further states that "it is unnecessary and unreasonable to include all such theoretical factors identified" in these circumstances . . . . But that misses the point.   The Court is less concerned with whether Plaintiffs

such difference in price will vary the larger the discrepancy (*e.g.* as to a 27-inch bat with a sticker weight that is off by 0.5 ounces versus the same model bat where the divergence is 2.6 ounces) and whether Boedeker will attempt to measure those price differentials, if any.

In addition to the above issues, Rawlings raises a contention that Boedeker's methodology fails at its inception because it does not take into account supply-side considerations.  *See* Opp. Am'd Mot. at 22-23.  That question is a difficult one and there have been decisions at the trial level going both ways as to whether the failure to deal with supply-side considerations automatically dooms the choice-based conjoint analysis.  *See, e.g., MacDougall v. American Honda Motor Co., Inc.*, No. SACV 17-1079 JGB (DFMx), 2020 WL 5583534, at *5 (C.D. Cal. Sept. 11, 2020) ("Boedeker's study calculates an inflated measure of damages because it does not adequately account for supply-side considerations."); *Saavedra v. Eli Lilly & Co.*, No. 2:12-cv-9366-SVW (MANx), 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014) ("By looking only to consumer demand while ignoring supply, Dr. Hay's method of computing damages converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants."); *In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119-21 (C.D. Cal. 2015); *but see contra Maldonado v. Apple, Inc.*, No. 3:16-cv-04067-WHO, 2021 WL 1947512, at *21 (N.D. Cal. May 14, 2021) (and cases cited therein); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018).[23]  Given the other problems with the Boedeker Report and its current incomplete status, the Court will not attempt to render a final decision on its purported failure to account for supply side considerations at this time.

For the above stated reasons, the Court finds that the Boedeker Report at this point does

---

have attempted to account for every factor that might affect the restitution analysis, and more concerned with whether Plaintiffs have shown how they can control for other factors (e.g., "brand, package size, seasonality of prices, year-to-year fluctuations in prices attributed to economic conditions") that may affect the value derived from the products – and which may be based on something other than Defendant's alleged misbranding . . . . Dr. May has provided a partial list of variables that will need to be controlled for, and attempts to postpone his explanation of how he will account for them until after class certification . . . . But the Rule 23(b)(3) analysis is more rigorous than the Rule 23(a) analysis, *see Comcast*, 569 U.S. at 34, and the Rule does not permit the Court to wait until after certification to assess whether Plaintiffs' Product Labeling Characteristics Model is capable of measuring economic injury attributable to the alleged misbranding on a classwide basis.  [Citations omitted.]

[23] In a non-precedential decision, the Ninth Circuit did affirm a district court's conclusion that a plaintiff's expert's conjoint analysis was insufficient for measuring class-wide damages because it failed to "reflect supply-side considerations and marketplace realities that would affect product pricing."  *See Zakaria*, 755 F. Appx. at 624.

not establish a model that demonstrates that damages can be *reliably* calculated on a classwide basis.

Additionally, Rawlings has moved to strike the Boedeker Report under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702 ("FRE 702"). *See* ECF No. 128. Both *Daubert* and Fed. R. Evid. 702 go to the trial court's gatekeeping function in regards to expert testimony. *See* Advisory Committee Notes to 2000 Amendments to FRE 702. Rawlings contends that:

> Boedeker's proposed conjoint study is demonstrably unreliable, unscientific, and based on unsound methodology. It, therefore, is properly excluded pursuant to FRE 702. *See, e.g., Zakaria*, 755 F. App'x at 624; *In re NJOY*, 120 F. Supp. 3d at 1119.

*See* MTS Boedeker at 14. However, there is a distinction between finding an expert's testimony to be unreliable and striking it. *See, e.g., In re NJOY*, 120 F. Supp. 3d at 1075 (declining to strike the testimony of plaintiff's expert Harris because it found that Harris's methodology comported with accepted principles and his analysis was relevant to the issues in the case) and at 1120 (where the court ultimately found that part of Harris's proposed method was "entirely subjective and lack[ed] any market-based component" and further concluded that plaintiff's damages methodology deficient under *Comcast Corp..*). The Court sees no reason to strike the Boedeker Report even though it finds the report very problematic. Further, as noted above, the Boedeker Report is merely an offer of proof and not a completed study. While *Daubert* provides for the exclusion of an unreliable expert opinion, the Boedeker Report does not qualify as an opinion – it is merely an attempt to delineate how such an opinion could be generated.

C. Further Consideration of Sotelo's Theory of Damages

Choosing bat weight, to a large extent, is a matter a personal preference. One player may want the faster swing speed of a lighter bat; another may want the greater power of a heavier one; and then there are issues as to control/precision. Further, the manner in which ball players accomplish their hitting goals involves manipulating a number of factors besides actual bat weight – including, but not limited to, bat composition, barrel diameter, swing weight, grips, knobs and end caps. That makes this case unlike most consumer-protection lawsuits, where consumer preferences as to the allegedly misrepresented attribute are aligned or at least limited to a few variables. Furthermore, unlike most other mislabelling lawsuits, Rawlings here would sell the product without the misrepresented feature (*e.g.*, the Youth 5150 27-inch bat with a -11 drop or actual weight of 16 ounces) for the same price as the mislabelled bat that weighed 18.6 ounces. If

Sotelo was unhappy because his bat weighed more than 16 ounces, there were other Rawlings bats he could have chosen from that did weigh 16 ounces. Sotelo has not offered any theory for why Rawlings might prefer consumers such as himself to purchase the 2018 Rawlings Youth 5150 bat (which Rawlings indicates was SKU US8511-27/16, *see* Opp. Am'd Mot. at 4) instead of those other options which were available for the same price.

Because bat weight is such a personal preference and Rawlings does not vary the price of its bats within the same model based on differences in weight, Sotelo's chosen theory of damages is problematic. It is true that in the Ninth Circuit "damage calculations alone cannot defeat certification." *Leyva*, 716 F.3d at 513-14 (citing *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010)). However, plaintiffs still "must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Id.* at 514 (citing *Comcast Corp.*, 569 U.S. 27); *see also Lambert v. Nutraceutical Corp.*, 870 F.3d 1170 (9th Cir. 2017) (holding that difficulties with class-wide damages will not defeat class certification, but only if "a valid method has been proposed for calculating those damages").

i.   *The types of monetary awards available*

Sotelo seeks monetary awards for six causes of action – the UCL, FAL, CLRA, and breach of express/implied warranty and unjust enrichment – that collectively provide two theories of recovery that Sotelo offers here: actual damages and restitution (also called "restitutionary damages").[24] *See* 2AC at 29 ("seeking restitution and monetary damages as appropriate"). Broadly speaking, the causes of action either "compensate [plaintiff] for actual loss" (through damages) or seek to return property that the defendant unlawfully acquired from the plaintiff and to deter future violations (through restitution). *See Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 695-96 (2006).

Whether characterized as actual damages or restitution, the monetary awards often come in one of two forms: benefit-of-the-bargain or out-of-pocket. *See, e.g., Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) ("Restitution is 'the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received.'") (quoting *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 177 (2000)); *Nguyen v. Nissan*

---

[24] The CLRA authorizes both forms of recovery, *see* Cal. Civ. Code §§ 1780(a), while the UCL and FAL are limited to restitution, *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 130 (2009) ("The remedies available in a UCL or FAL action are limited to injunctive relief and restitution.").

*North America, Inc.*, 932 F.3d 811, 818 (9th Cir. 2019) ("Plaintiff's proposed benefit-of-the-bargain measure of damages is . . . cognizable under the CLRA").[25]   Benefit-of-the-bargain damages compensate for "the difference between the actual value of what plaintiff has received and that which he expected to receive." *Overgaard v. Johnson*, 68 Cal. App. 3d 821, 823 (1977). By contrast, out-of-pocket damages compensate for "the difference between the actual value received and the actual value conveyed."[26]   *Id.*

The two methods share one calculation in common: the "actual value" received by the purchaser.  How a court measures the "actual value" of the allegedly defective product is important because different methods can yield very different results.

> ii. *The measure of value: what the market would have paid versus what the purchaser would have paid*

Sotelo seeks out-of-pocket damages, which depend on calculating the "value" of Rawlings's allegedly defective bats.  *See* Mot. at 14 (referring to Boedeker's measurement of "the overpayment due to Defendant's misrepresentations").[27]   "'[V]alue,' in connection with legal problems, ordinarily means market value." *Bagdasarian v. Gragnon*, 31 Cal. 2d 744, 753 (1948). Accordingly, in awarding both benefit-of-the-bargain and out-of-pocket damages, courts applying California law[28] look to the market value of the goods at issue.  *See, e.g., Zakaria v. Gerber Prods. Co.*, No. 15-cv-00200 (JAK), 2017 WL 9512587, at *20 (C.D. Cal. Aug. 9, 2017) (holding that actual damages under the CLRA depends on "market value[s]"), *aff'd*, 755 Fed. App'x 623 (9th Cir. 2018); *Werdebaugh v. Blue Diamond Growers*, No. 12-cv-02724 (LHK), 2014 WL 7148923, at *8 (N.D. Cal. Dec. 15, 2014) (holding that restitutionary awards under the UCL and CLRA are "determined by taking the difference between the market price actually paid by consumers and the

---

[25] *See also Sharpe v. Puritan's Pride, Inc.*, 466 F. Supp. 3d 1066, 1076 (N.D. Cal. 2020) (observing that "[n]o specific damage measure is prescribed in the CLRA, and the door is open to any reasonable measure," including out-of-pocket losses); *Ironshore Specialty Ins. Co. v. 23andMe, Inc.*, No. 14-cv-03286, 2015 WL 2265900, at *4 (N.D. Cal. May 14, 2015) ("Under California law the remedies for breach of the implied warranty include 'benefit of the bargain' damages); *cf. Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995) ("There are two measures of damages for fraud: out-of-pocket and benefit of the bargain.").

[26] As an example of the difference between the two, suppose Alex buys a car from Bob for $5,000.  Bob told Alex that the car was a Model *X*, which is worth $6,000.  However, the car is actually a Model *Y*, which is worth $4,000.  The benefit-of-the-bargain damage is $2,000, while the out-of-pocket damage is $1,000.

[27] The overpayment is the difference between the price that Sotelo paid for the bat and the "actual value" of the bat, *i.e.*, Sotelo's out-of-pocket loss.

[28] Sotelo asserts his claims under California law, or alternatively Missouri law.  The parties did not discuss the choice-of-law issue, and for this analysis the Court assumes for purposes of the present discussion that California law applies.

true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices"); *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 223-24 (S.D.N.Y. 2019) (finding that under California law, the plaintiffs' claim "depends on calculating the market value of the allegedly defective cars that Plaintiffs purchased").

The Court is mindful of the Ninth Circuit's contrary conclusion – based on its reading of a California Supreme Court case – that "UCL and FAL restitution is based on what a purchaser would have paid at the time of purchase had the purchaser received all the information." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (suggesting that there would be positive restitution even if the marketplace would continue to value the product as highly as the amount the purchaser paid, and, in doing so, relied on the decision in *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 330 (2011)). Respectfully, the Court finds the district court's interpretation of California law in *In re Gen. Motors LLC Ignition Switch Litig.* to be more persuasive, which found that *Pulaski* "appears to overread the California Supreme Court case on which it relies."[29] 407 F. Supp. 3d at 224. In a case involving locksets with allegedly misleading "Made in U.S.A." labels,[30] the California Supreme Court held that a plaintiff satisfies the UCL's *standing* requirement "by alleging[ ] . . . that he or she would not have bought the product but for the misrepresentation" at issue. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 330 (2011). Such an allegation was sufficient to allege economic injury because it permitted the reasonable inference that "because of the misrepresentation the consumer (allegedly) was made to part with more money than he or she otherwise would have been willing to expend, *i.e.*, that the consumer paid more than he or she actually valued the product." *Id.* According to the *Kwikset* court, "the extra money paid[] is economic injury and affords the consumer standing to sue." *Id.* This was the case even if "the marketplace would continue to value the product as highly as the amount the consumer paid for it." *Id.* at 333. The Ninth Circuit in *Pulaski* appeared to suggest that this extra money would also be an appropriate measure of restitution.

---

[29] "When interpreting state law, federal courts are bound by decisions of the state's highest court. In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions as guidance." *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 865 (9th Cir. 1996) (quotations omitted). A decision from our court of appeals interpreting state law is "only binding in the absence of any subsequent indication from the California courts that [its] interpretation was incorrect." *Owen ex rel. Owen v. United States*, 713 F.2d 1461, 1464-65 (9th Cir. 1983).

[30] The locksets apparently either contained screws or pins made in Taiwan or involved some subassembly in Mexico.

However, the California Supreme Court in *Kwikset* was clear that its holding concerned only standing to sue under the UCL or FAL, not the appropriate measure of restitution. *Id.* at 335 ("[T]he standards for establishing standing under [the UCL] and eligibility for restitution under [the UCL] are wholly distinct."). *Kwikset* stands for the unexceptional proposition that a plaintiff who alleges a subjective loss has standing to seek the UCL's non-monetary remedies, even if that same plaintiff may not be able to prove entitlement to a monetary award. *Id.* at 329-31, *see also id.* at 336 ("That a party may ultimately be unable to prove a right to damages (or, here, restitution) does not demonstrate that it lacks standing to argue for its entitlement to them.").

This Court sides with "the weight of post-*Kwikset* and post-*Pulaski* authority holding that a plaintiff must have 'substantial evidence' of 'measurable amounts' of an objective loss, measured according to the difference in *market value* of the property lost and the property received." *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d at 225 (citing *Zakaria*, 2017 WL 9512587, at *20-21, *aff'd*, 755 Fed. App'x 623 (9th Cir. 2018)) (emphasis added). This includes a Ninth Circuit case applying *Pulaski* to affirm a district court's finding that plaintiff's damages model was inadequate because it "showed only how much consumers subjectively valued the [allegedly misleading label], not what had occurred to the *actual market price* of [the product] with or without the label"). *See Zakaria*, 755 Fed. App'x at 624-25 (emphasis added).[31]

### iii.  *Sotelo's use of what the purchaser would have paid for allegedly defective bats*

The problem with Sotelo's damages model is that it does not use the market's valuation of the allegedly defective bats, but rather relies on the deceived purchaser's valuation, *i.e.*, "what a purchaser would have paid at the time of purchase had the purchaser received all the information." *Pulaski*, 802 F.3d at 989. There is a big difference between the two. Take Sotelo's bat for example, the 2018 Rawlings Youth 5150 bat, which was 27 inches long, and had a sticker weight of 16 ounces and a drop of -11. Sotelo complained that the bat actually weighed 18.6 ounces and that alleges that had he known the scale weight, he would have been willing to purchase the bat only for a much lower price than what he paid. The Court does not doubt Sotelo's subjective position. But suppose the bat were correctly labeled with the scale weight. The Court suspects that the

---

[31] It is true that "[i]n contrast to actual damages, the discretion of courts to award restitution under the UCL, FAL and CLRA "is very broad." *Zakaria*, 2017 WL 9512587, at *20. However, "that discretion is not 'unlimited' . . . and does not extend beyond the boundaries of the parties' evidentiary showing." *Colgan*, 135 Cal. App. 4th at 700 (citation omitted).

demand for a 2018 Rawlings Youth 5150 bat that was advertised at as 27 inches long and having a sticker weight of 19 ounces[32] and a drop of -8 would not be that different.  Given the fact that Rawlings sells all of the SKUs of a particular model for the same price regardless of weight, Rawlings would have sold the bat at the same price.

Sotelo uses a damages model outlined by Boedeker, a statistician and economist.  Boedeker proposes using conjoint analysis to model what the demand and supply curves for Rawlings bats would look like in the absence of the alleged misrepresentations about weight.  *See* Boedeker Report ¶¶ 12-36.  Conjoint analysis uses survey data asking respondents questions about their preferences for various combinations of product attributes (*e.g.* weight, length, brand) that include the allegedly misrepresented attribute.   By observing how respondents evaluate products in response to changes in the attributes offered at different price levels, conjoint analysis supposedly "enables one to estimate the relative value consumers place on one attribute [such as bat weight] over another" and to model the modified demand curve in a world without the misrepresentation. The theory is that without the alleged misrepresentation, the demand curve for the product will shift down.  The economic loss is the resulting decrease in the new equilibrium price.



*Id.* ¶ 34.  However, Boedeker's proposal models the wrong demand curve.

Boedeker's description confirms that his model is not measuring the market value of the bats.  He describes the applicable legal standard as "requir[ing] compensation based on the

---

[32] Rawlings appears to use only whole numbers in the sticker weights.  Therefore, Sotelo's bat 18.6-ounce bat, in this hypothetical, would likely have a sticker weight of 19 ounces.

difference between what was paid and what *a reasonable consumer* would have paid at the time of purchase absent the false or misleading information or omissions." *Id.* ¶ 22 (emphasis added). This much is true and, as applied to Sotelo, this would be the difference between: (1) what Sotelo paid for his Rawlings bat that had a sticker weight of 16 ounces but actually weighed 18.6 ounces; and (2) what the *market value* would be for that identical 2018 Rawlings had it been labeled with the correct sticker weight and drop (*i.e.*, absent the false or misleading 16 ounce sticker weight and -11 drop).   As noted earlier, the Court suspects that the demand for a 19 ounce bat is not that different from the demand for a 16 ounce bat that is similar in all other respects (*e.g.*, brand, length, shape, material, etc.), and that Rawlings would have charged the same price for Sotelo's bat even with the correct labeling.   The Court's speculations may not count for much, but the Court has nothing else to rely on because Boedeker's report does not purport to model what this demand would be.   As Boedeker makes clear, he is not modeling the market value of Sotelo's bat if it had been correctly labeled as a 19-ounce bat, but rather "how class members [*looking for a 16-ounce bat*] would have valued [Sotelo's bat] had they known at the point and time of purchase that the claims associated with the product were partially or entirely false." *Id.* ¶ 23.   In other words, he is using the valuation of a non-representative sample of the pool of bat purchasers.

That Boedeker proposes modeling how the deceived purchasers would have valued the bats – rather than how the overall market would have valued them – can be seen in his survey design. The proposed survey group consists of adult California-residents who purchased a baseball bat. Each of them are asked a preliminary set of questions "about the bat they are looking for," including bat weight.   *Id.* ¶ 65.   For a hypothetical respondent who is shopping for a 30 inch, 20-ounce bat that is in the price range of $149.99 to $249.99, Boedeker would ask the following question:

Please indicate which of the options you would select.

|  | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 |
|---|---|---|---|---|---|
| Actual Weight (ounces) | 20 | 18.5 | 23 | 20.5 | 21.8 |
| Material | Hybrid | Aluminum | Aluminum | Hybrid | Composite |
| Warranty | 30 days | 30 days | 1 year | 90 days | 1 year |
| Brand | Rawlings | Louisville Slugger | Easton | Louisville Slugger | Marucci |
| Price | $174.99 | $199.99 | $149.99 | $249.99 | $199.99 |
| Which option would you prefer? | ○ | ○ | ○ | ○ | ○ |

Would you purchase this option?        ○ Yes      ○ No

Boedeker Rep. ¶¶ 66-72.  In reasoning that "[i]n the but-for world, where consumers were told the truth about misrepresentation at the point of purchase, consumer demand for the Product is likely to be lower," Boedeker presumes (correctly) that our hypothetical respondent will indicate a willingness to pay a price premium for bats that weigh closer to 20 ounces.  The same will be true for the rest of respondents, with their varying preferences for bat weight.[33]  But a demand curve built on this data is not a model of what the overall market demand for the product will be.

<i>iv.  Why the measure of damages matters</i>

The measure of damages matters here because bat weight is a personal preference, and therefore the market value and how much Sotelo would have paid for his Rawlings bat had he known it weighed 18.6 ounces will not be the equivalent of the market value of that bat.  While Sotelo may have little use for his 18.6-ounce bat and would have paid much less for it, that does not mean that the market value of those bats is different than what Rawlings charged for them.

A conjoint analysis along the lines of what Boedeker proposes will incorrectly yield a non-zero loss amount when – assuming, as seems likely, that Rawlings could have corrected the sticker weight of the allegedly defective bats and sold them for the same market price – Sotelo has suffered zero out-of-pocket damages.

### D.  An Injunctive-relief Class under Rule 23(b)(2)

Sotelo alternatively asks to certify the proposed class under Rule 23(b)(2), which provides for class certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. Proc. 23(b)(2); *see Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014).  Thus, a Rule 23(b)(2) class may only be certified if the named plaintiffs demonstrate their standing to seek injunctive or declaratory relief.

In order to have standing for prospective injunctive relief, a plaintiff must establish a "real and immediate threat of repeated injury."  *Chapman v. Pier 1 Imports (U.S.) Inc*., 631 F.3d 939,

---

[33] As Rawlings's expert contends, Boedeker's use of these preliminary questions to identify the respondents' bat-weight preferences is not standard practice.  *See* Wilcox Report ¶ 16 (characterizing it as "a non-standard conjoint survey in which the attribute levels of the key attribute ('actual weight' or 'actual drop') are dynamically generated for each respondent based on answers provided before the choice tasks").

33

946 (9th Cir. 2011) (*en banc*) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).  "[P]ast wrongs do not in themselves amount to that real and immediate threat of injury."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983).  Instead, the plaintiff is not entitled to an injunction against past illegal conduct unless he (or she) demonstrates "a sufficient likelihood that he will again be wronged in a similar way."  *Id*. at 111; *see also Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) ("Once a plaintiff has been wronged, he is entitled to injunctive relief only if he can show that he faces a real or immediate threat that he will again be wronged in a similar way.") (alterations and internal quotation marks omitted).  The threat of harm cannot be "speculative."  *Lyons*, 561 U.S. at 111.

An issue arises as to the extent that Sotelo – because he is a previously deceived consumer – can allege/establish a basis for future injury from Rawlings's past conduct that would be sufficient to create Article III standing for him to seek class-wide injunctive relief.  That issue arises from two situations in this case.  First, the Ninth Circuit has held that: "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an 'actual and imminent, not conjectural or hypothetical' threat of future harm . . . .  In some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to."  *Davidson v. Kimberly-Clark Corp*., 889 F.3d 956, 696-70 (9th Cir. 2018).[34]  In the SAC, Sotelo does not appear to allege that he is actually desirous of purchasing Rawlings youth metal baseball bats in the future.  The cases following *Davidson* have made it clear that, to have Article III standing, a previously-deceived consumer plaintiff must allege an actual intention of a future purchase if the product was truthfully labelled, not merely an expression of a general consideration of a possible purchase in the future.  *See, e.g. Lanovaz v. Twinings N. Am., Inc*., 726 F. Appx. 590, 591 (9th Cir.

---

[34] As observed in *Hesse v. Godiva Chocolatier, Inc*., 463 F. Supp. 3d 453, 464 (S.D.N.Y. 2020), in declining to follow *Davidson*: "The Ninth Circuit is the only Court of Appeals to have directly addressed whether plaintiffs have standing to seek injunctive relief in these circumstances."  *See also In re Subaru Battery Drain Products Liab. Litig.*, No. 1:20-cv-03095-JHR-JS, 2021 WL 1207791, at *31 (D.N.J. March 31, 2021) ("the Third Circuit and other courts have squarely rejected *Davidson*'s reasoning and conclusion, finding the threat of injury that repeat customers 'might suffer as a result of the company's advertising practices [to be] 'wholly conjectural.''  *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Practices & Liab. Litig*., 903 F.3d at 292 (quoting *McNair v. Synapse Group Inc*., 672 F.3d 213, 223 (3d Cir. 2012).").

2018); *Krause-Pettai v. Unilever United States, Inc.*, No.: 20cv1672 DMS (BLM), 2021 WL 1597931, at *7 (S.D. Cal. Apr. 23, 2021); *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1007-08 (N.D. Cal. 2020).  Given that Sotelo has not alleged in the SAC that he has any sufficiently concrete intention of purchasing a Rawlings bat in the future, he has not averred a basis for Article III standing to pursue injunctive relief under Rule 23(b)(2).[35]

Second, and probably more importantly, even if Sotelo had adequately alleged a future intent to purchase a Rawlings bat in the future, he still would not be able to bring a Rule 23(b)(2) class action for injunctive relief because Rawlings has already taken satisfactory steps to remedy the situation regarding the scale weight and drop vis-à-vis the bats. Rawlings's argument that Sotelo lacks the necessary standing to certify an injunctive-relief class raises the issue of mootness. Rawlings's 2020 lineup of bats (and the models thereafter) do not contain a sticker weight, and for those bats that include a drop, there is a disclaimer stating that "drop is not intended to and should not be relied upon to calculate the actual weight of this bat as sold."  *See* Murphy Depo at 250, ECF No. 72-5 at page 15 of 17.  Sotelo does not argue that, in fact, Rawlings has not removed the scale weights from the advertisements and specifications for the bats, or that, when reference is made to the drop in those materials, it is accompanied by the delineated disclaimer.[36]  *See, e.g.,* Plaintiff's Reply in Support of Amended Motion for Class Certification at 24-25, ECF No. 135-2. While Sotelo now concedes that there is no direct misrepresentation of the bat's scale weight, he argues that where drops are included, they still (by themselves) constitute a misrepresentation "because telling consumers 'the bat's drop should not be used to calculate the scale weight' is not the same as disclosing the Drop is a false statement in and of itself." *Id.* at 25.  The Court disagrees.

---

[35] In Plaintiff's Reply in Support of Amended Motion for Class Certification ("Reply") at 25, ECF No. 135-2, Sotelo notes that in his deposition he stated that he "hopes" his son will play baseball again and that, if his son did so, he would consider buying a Rawlings bat.  However, that general and amorphous statement is not enough to provide standing under applicable law. *See Lanovaz*, 726 F. Appx. at 591; *Krause-Pettai*, 2021 WL 1597931, at *7; *Anderson*, 500 F. Supp. 3d at 1007-08.

[36] As stated in *Nguyen v. Medora Holdings, LLC*, No. 5:14–cv–00618–PSG, 2015 WL 4932836, at *8 (N.D. Cal. Aug. 18, 2015):

> To be sure, past wrongs can be "evidence bearing on whether there is a real and immediate threat of repeated injury, even if they 'do not in themselves amount to real and immediate threat of injury necessary to make out a case or controversy.'"  But in seeking to enjoin allegedly illegal conduct that defendant has voluntarily discontinued, the moving party must satisfy the court that relief is needed because "there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."  Plaintiffs show no evidence and point to nothing to suggest there is any "threat" that Medora will change its label back to include an "all natural" statement, or that an injunction issued by the court would have any impact on any consumers, let alone Plaintiffs personally.

Sotelo's claim that the drop is misrepresented because he assumes that consumers will still assume that the drop measures the difference between the bat's length and scale weight – but that is precisely what the disclaimer disclaims.  It specifically instructs the customer that the "drop is not intended to and should not be relied upon to calculate the actual weight of this bat as sold" because of "manufacturing tolerances, certification calculations and standards, or added materials such as grip tape or decals."  The Court finds that language to be sufficient to place a reasonable consumer on notice that he or she should not use the drop to calculate the final and actual weight of the bat.[37]

Because Sotelo has made *no* showing that: (1) Rawlings will resume its placement of the sticker weight on its bats or advertisements, (2) Rawlings's disclaimer/instruction is insufficiently clear that the drop is not to be utilized in calculating the bat's actual weight, and/or (3) he has expressed an adequate intention of purchasing a Rawlings bat in the future, Plaintiff has not shown the likelihood of substantial and immediate irreparable injury to establish standing for injunctive relief for purposes of Rule 23(b)(2).

## IV.   Conclusion

Based on the foregoing discussion, the Court **DENIES** the amended motion for class certification and the motion to strike the Boedeker Report.

---

[37]   The standard to be used in evaluating whether an advertisement is deceptive under the UCL is purely a question of law.  *See Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1300-01 (2011).